U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

SEP 3 0 2008

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## ALEXANDRIA DIVISION

| | |
|---|---|
| ALBERT DUPUY and LORRAINE DUPUY | CIVIL ACTION NO. 06-0206-A |
| -vs- | JUDGE DRELL |
| UNITED STATES OF AMERICA | MAGISTRATE JUDGE KIRK |

### REASONS FOR JUDGMENT

Plaintiffs, Albert and Lorraine Dupuy, filed this suit in January 2006 seeking damages for personal injuries allegedly sustained as a result of a surgical procedure Albert Dupuy underwent at the Veterans Affairs Medical Center ("VAMC") in Shreveport, Louisiana. Issue was joined, and jurisdiction is proper in this Court under 28 U.S.C. §1346(b). The matter has been tried before this Court, and all appropriate post-trial submissions have been made. For the reasons set forth below, compiled after a painstaking review of the testimony, the depositions, the voluminous medical evidence, and the scant argument presented by all counsel, this Court renders judgment as follows: in favor of Plaintiff, Albert Dupuy, and against Defendant, United States of America, in the amount of $306,709.30 plus costs as provided by law; and in favor of Plaintiff, Lorraine Dupuy, and against Defendant, United States of America, in the amount of $20,000.00 plus costs as provided by law.

# I. THE EVIDENCE

## A. Mr. Dupuy's Medical and Employment Histories

In October 2001, Mr. Albert Dupuy was sixty-three years old and lived with his wife, Lorraine, in Avoyelles Parish, Louisiana. Records from the Social Security Administration ("SSA") show Mr. Dupuy was found disabled secondary to back problems beginning on May 1, 1994.[1] Functionally, Mr. Dupuy noted in 1994 that he could not sit or stand for extended periods of time, his legs would start "going dead" when he walked less than one hundred feet, he had trouble sleeping, and it took him longer than normal to tend to his personal care needs.

Medical reports from Dr. Robert Po, an orthopaedic surgeon, reveal Mr. Dupuy injured his back at work in 1974. Surgery was recommended, but Plaintiff, instead, opted for conservative treatment. He returned to work performing hard labor. Then, in approximately 1984, he transitioned into a managerial role. Mr. Dupuy stopped working secondary to back pain in 1994. In July of 1994, he had residual complaints of occasional pain in his neck and left arm and back pain that Plaintiff rated as a "seven" on a scale of "one" to "ten." His abilities to drive, stand up straight, and care for his personal hygiene were limited. Dr. Po specifically noted that Mr. Dupuy stood "stooped over." In a letter dated August 1994, Dr. Po explained Mr. Dupuy had limited motion with a limp to the left side. Plaintiff was unable to walk on his toes or heels; he had spasm in his back and limited motion of his spine with weakness; and x-rays showed degenerative

---

[1]

Exhibit 17.

2

arthritis and an old compression fracture in the thoracolumbar area with associated arthritis. Dr. Po felt Mr. Dupuy's prognosis at the time was guarded, and he imposed the following physical limitations: no pushing, pulling, or lifting, and no standing more than thirty minutes at a time.

Mr. Dupuy felt his health was getting better in October 2001. Although he was still receiving disability payments from SSA,[2] he was managing a "mini-storage" facility, he was doing some construction work, he cut grass with tractors and his riding lawn mower, and the only medication he was taking was one aspirin per day. He also used baking soda for occasional heartburn.

Mr. Dupuy first learned he had an abdominal aortic aneurysm ("AAA") during a routine doctor's visit to the Alexandria VAMC in approximately 1999. He was later referred to the Shreveport facility for surgical evaluation.[3]

B. Facts Regarding the Type of Surgery to be Performed

Dr. Travis Phifer, a board certified vascular surgeon, testified he served as chief of the division of vascular surgery at Louisiana State University Health Sciences Center School of Medicine in Shreveport ("LSU-S") in 2001. Through his examinations of Mr. Dupuy and review of Plaintiff's test results at that time, Dr. Phifer considered Mr. Dupuy's aneurysm to be unstable. Specifically, he explained the aneurysm had grown

2

Payment records show Mr. Dupuy was receiving approximately $1,300 to $1,500 per month in SSA disability benefits from 2001 through 2006. (Exhibit 17.)

3

He was also offered referrals to the VAMC facilities in New Orleans, Houston, and Little Rock. However, he chose the Shreveport location, and he did not speak with any doctors at the other hospitals.

3

substantially in size within a few months, and if the condition were not surgically addressed, it could cause Mr. Dupuy's death.

By October 2001, less-invasive endovascular repairs were gaining popularity but had not become commonplace in the Shreveport area. Dr. Phifer had yet to perform an AAA repair without opening the abdomen completely. Nevertheless, Dr. Phifer offered the less-invasive option to Mr. Dupuy during a lengthy phone conversation prior to the surgery. Dr. Phifer felt Plaintiff would be a good candidate for the newer procedure, but it was his understanding Mr. Dupuy chose the more traditional method because Dr. Phifer had never personally handled an endovascular repair.[4]

Mr. Dupuy recalls having a lengthy conversation with Dr. Phifer about the types of surgery available to him. Dr. Phifer offered and explained the less-invasive endovascular operation. However, Mr. Dupuy chose the open procedure.[5]

---

[4]

Dr. Phifer stated that when he did begin performing the less-invasive procedure, another surgeon, who had more experience, came to Shreveport and proctored him.

[5]

Before he talked with Dr. Phifer about the less-invasive method, Mr. Dupuy had met and spoken with some of Dr. Phifer's patients who had undergone the open surgery. Those individuals were doing well. Mr. Dupuy testified he "had already made up [his] mind" to have the more involved surgery. Later, after Dr. Phifer explained there was another option, Mr. Dupuy's decision was reinforced by the fact Dr. Phifer had never personally performed the newer procedure.

La. R.S. 40:1299.40 sets forth the requirements for obtaining valid consent to perform a medical procedure in Louisiana. While Plaintiff does not claim this statute has been violated, he does allege he was not appropriately informed of the alternatives to the open repair surgery, because only a surgeon who had actually performed the alternative procedure could properly explain that method. Plaintiff has cited no legal authority in support of this position, and we have found none.

4

C. Testimony from the Doctors Performing the October 2001 AAA Repair Surgery

**(1) Dr. Richardson**

Dr. Kathryn Richardson, a board certified general surgeon who completed her training in June 2002, testified that in October 2001 she was in her final year of residency at LSU-S.[6] During that time, she engaged in a three-month rotation on the vascular surgery service, and she participated in vascular surgeries as part of her duties at the Shreveport VAMC.[7] Dr. Richardson did not independently recall participating in Mr. Dupuy's AAA repair surgery. Rather, her testimony was based on her review of the medical records.

Although she did not complete the history and physical examination on October 9, 2001,[8] Dr. Richardson felt the examination was adequate. She interpreted the vascular portion of that examination to show Mr. Dupuy had appropriate pulses at the groin and the feet, bilaterally, indicating no significant vascular disease in the legs below the aneurysm. Dr. Richardson did, however, prepare the preoperative note stating Mr. Dupuy had been seen by cardiology and was deemed at low risk for surgery.[9]

---

[6]
    *See also* Exhibit 16.

[7]
    Dr. Richardson estimated she assisted in approximately ten aortic aneurysm repair surgeries during her residency. She could not remember, however, if Mr. Dupuy's was the first such procedure in which she was involved.

[8]
    The history and physical examination was performed by Dr. Danielle Hood, a general surgery intern. (Exhibit 7A, pp. 47 - 47a.)

[9]
    Exhibit 7A, p. 48.

5

Dr. Richardson testified according to the records, that she assisted Dr. Phifer, who performed Mr. Dupuy's surgery.[10] The procedure was complicated by Mr. Dupuy's weight of 256 pounds, which lengthened the surgery by increasing the amount of time it took to reach the aorta and then close the wound. She explained, however, that his size did not affect the amount of time the aorta was clamped. Dr. Richardson also noted that during the time the aorta is clamped in a procedure such as this, some blood flows to the legs through collateral vessels.

The post-operative report, prepared by Dr. Richardson, shows the operation began at 8:55 A.M. and ended at 3:26 P.M. on October 10, 2001. This is corroborated by the anesthesia record.[11] Dr. Richardson defended the relative brevity of the post-operative report by testifying she did not feel any significant complications, such as injuries to the bowel, colon, intestines, ureter, kidney, or spleen had occurred. She explained that she included the fact a repair stitch was needed on the back of the aorta, because such a stitch is difficult to place. She did not interpret the blood loss or acidosis noted on the report as being particularly unusual in a case such as Mr. Dupuy's.

### (2) Dr. Phifer

Dr. Phifer specifically recalled treating Mr. Dupuy and performing the October 2001 AAA repair with assistance from Dr. Richardson. Dr. Phifer reiterated Dr. Richardson's testimony that there was no indication prior to the surgery that Mr. Dupuy

---

[10]

The post-operative report, which was dictated by Dr. Richardson, lists Dr. Richardson as the surgeon and Dr. Phifer as the attending surgeon. (Exhibit 7A, pp. 151-153.)

[11]

Exhibit 7A, pp. 149 and 151.

had any occlusive vascular problems with his legs below the level of the aneurysm and that the pre-operative lower extremity examination was adequate. The pulses at the tops of Plaintiff's legs and at his feet were also good after the surgery, which told Dr. Phifer the graft was functioning well.

Dr. Phifer testified Mr. Dupuy was approximately 100 pounds overweight in October 2001, and this obesity impacted the AAA repair by making it more difficult to visualize and access the appropriate vessels. The surgery was also complicated by the fact the aneurysm involved not only the aorta, but also both common iliac arteries. Therefore, it required more extensive grafting than would an aneurysm that did not extend beyond the aorta.[12] It was not, however, as complex as it would have been if the renal or internal iliac arteries had been involved.

As far as the method of arterial clamping time is concerned, Dr. Phifer testified normally the abdomen is opened, the bowel is rolled away, the patient is given Heparin to keep the kidneys flowing, and then, approximately fifteen minutes later, the clamps are placed. These clamps substantially reduce the blood flow to the legs but do not stop it completely. The clamps are then sequentially removed as different phases of the procedure are completed. Dr. Phifer testified that the clamps are usually placed about ninety minutes into the process. Approximately two hours later, all the clamps except the one on the left side would be removed, and the remaining clamp would be taken off after three to three and one-half hours. In this particular case, Dr. Phifer extrapolated from the anesthesia record that the first clamp on the aorta and the two clamps on the

[12] See Exhibits 23 and 24.

7

iliac arteries were placed at about 10:00 A.M., and they had all been removed before 1:20 P.M.[13] Dr. Phifer adamantly denied that the right leg was deprived of its main blood supply for three hours and forty-five minutes and that the left leg was deprived of its main blood supply for four hours and forty-five minutes.

When asked about the relative complexity of the procedure, Dr. Phifer explained it was an uncomplicated case, but it was not simple. Rather, he said, it was "a difficult aneurysm" based on Mr. Dupuy's size and the involvement of the aorta and the iliac arteries. However, no particular problems developed during the procedure.

### (3) The Post-Surgery Complications and Treatment

Dr. Richardson performed a fasciotomy on Mr. Dupuy's left calf the day after the aneurysm repair surgery. She explained this was necessitated by a compartment syndrome that occurred when the blood supply was reintroduced after it had been interrupted while the aorta was clamped. She did not note any muscle death in the calf. Dr. Phifer was not sure what had caused the compartment syndrome. At trial, he testified he felt it had something to do with the period of clamping and possibly with a body positioning issue during the surgical procedure. At his deposition, he said it could have been caused by a combination of things, including peripheral vascular disease and the reduced blood flow caused by the clamping. Dr. Phifer also corroborated the testimony of Dr. Richardson that no muscle death in the left leg was apparent during or after the fasciotomy.

---

[13]

The anesthesia record contains the notation "1320 ½ aorta unclamp." (Exhibit 7A, p. 158.) Dr. Phifer interpreted this to mean he removed his hand from the aorta at 1:20 P.M., and that the surgical clamps were removed prior to that time.

Dr. Richardson and Dr. Phifer both explained Mr. Dupuy developed renal failure during his course of hospitalization, which condition necessitated dialysis. By the time he was discharged in November 2001, however, he was no longer undergoing dialysis. Under the circumstances presented, Dr. Phifer did not find Mr. Dupuy's post-operative complication of renal failure to be particularly unexpected. Dr. Richardson interpreted blood test results showing certain measures of kidney functioning ("BUN" and Creatinine) were similar several years before and several years after the AAA repair surgery.[14] She testified she was not concerned about lingering damage to Mr. Dupuy's kidneys secondary to the October 2001 surgery.

Dr. Richardson also noted Mr. Dupuy was given a pacemaker during his post-operative course of treatment, but she deferred to the judgment of the cardiologist regarding the reasoning behind implantation of that device.

Dr. Richardson further acknowledged Mr. Dupuy suffered other complications following the surgery, including a rapid, in-hospital, weight-gain of fifty-two pounds of fluid, congestive heart failure, and agitation/hallucinations that required medication and the placement of restraints.

D. Mr. and Mrs. Dupuy's Testimony Regarding the Post-Surgical Course

When Mr. Dupuy awoke after the surgery, he believes seventeen or more days had passed. He remembers being embarrassed because he was having bowel control problems. He also recalls pain and alternating hot and cold sensations in his feet unlike any problems he had previously experienced secondary to his pre-existing back

---

[14] Exhibit 9, pp. 1 and 11.

problems. Mr. Dupuy remembers undergoing some therapy at VAMC in Shreveport, but he could not sit or stand on his own, he was unable to feed himself, and he was restrained. The day before he was to be discharged from VAMC and transferred to a rehabilitation hospital, Mr. Dupuy remembers being told he was going to have a pacemaker implanted, because his heart was "fluttering."

Mr. Dupuy thinks he was in the rehabilitation hospital for about three months.[15] He was initially quite depressed, but he began improving through exercise. He was in a wheelchair when he left the rehabilitation hospital. He continued physical therapy,[16] and he eventually progressed to a walker, crutches, and, eventually, a cane. He estimates that he was able to ambulate without assistance by March 2002, and he was driving again by January 2002. He attempted to return to work managing the mini-storage facility, but he was not able to perform all the physical tasks required of the position. Mr. Dupuy said he also experienced sexual dysfunction[17] and nightmares subsequent to the AAA repair surgery.

Mrs. Lorraine Dupuy testified that, although she did not visit Mr. Dupuy daily, she was aware that he was unconscious for two or three weeks after the surgery and was on a ventilator during that time. She also knew that when he awoke in the Intensive

---

[15]

Records from HealthSouth Rehabilitation Hospital in Alexandria, Louisiana show Mr. Dupuy was admitted to that facility on November 15, 2001 and was discharged on December 21, 2001. (Exhibit 19.)

[16]

He stopped attending formal physical therapy, because "it was a joke."

[17]

Mr. Dupuy had been informed before surgery that he might experience sexual dysfunction after the procedure. However, he testified he did not understand how severe the condition would be.

10

Care Unit, he did not recognize some people, and he would say things that did not make sense. Although Mr. Dupuy has continued to complain of pain in his feet, he does get some relief from his medications. At one point, he asked a friend to build a device that would keep the weight of the bed sheet off his feet. Regarding the fasciotomy wound, Mrs. Dupuy estimated she helped clean and dress the area for approximately two months after Mr. Dupuy came home. She further explained that Mr. Dupuy also experienced some falls after he was discharged from the rehabilitation hospital, and that the medication he was taking seemed to be helping with his depression.

E. Additional Medical Records

Records from the Shreveport VAMC[18] show that on the night of the AAA repair, Mr. Dupuy developed myoglobinuria and rhabdomyolysis resulting in renal failure that necessitated dialysis. This condition improved and the dialysis was eventually terminated. He was also found to have a compartment syndrome in his left leg, which was treated by fasciotomy on October 11, 2001. He was maintained on a ventilator for ten to fourteen days but was successfully weaned from that device. Approximately a week before he was discharged, he had "some problems with dysrhythmias" as well as "an episode of a six second pause with dropped beats."[19] Accordingly, he was given a pacemaker on November 9, 2001.

---

[18]

   Exhibit 7.

[19]

   Exhibit 7, p. 6.

11

Records from HealthSouth Rehabilitation Hospital ("HealthSouth")[20] reveal Mr. Dupuy was admitted to that facility on November 15, 2001 and was discharged on December 21, 2001 with the following diagnoses: status post AAA repair; generalized deconditioning with impaired gait; peripheral polyneuropathy; compartment syndrome, left calf, status post fasciotomy; resolving acute renal failure; hypertension; gastroesophageal reflux disease; prior history of myocardial infarction; postoperative anemia; malnutrition; depressed mood with adjustment disorder; and constipation. During the course of his hospitalization, he was noted to have improved significantly. His kidney function had stabilized, and his dialysis catheter had been removed. His anemia was reported to have steadily improved to the point that the medication for this condition had been discontinued. Likewise, the discharging physician, Dr. Michael Dole, said Mr. Dupuy's mood had stabilized, Plaintiff denied depression, and he was no longer being given antidepressant medication. Dr. Dole felt the foot pain was "likely due to a peripheral polyneuropathy that most likely relates to his medical illness. Also the possibility of a peroneal nerve palsy due to compartment syndrome."[21] Mr. Dupuy was taking Neurontin, which seemed to be helping with the pain. Electrodiagnostic studies were suggested, and possible orthopaedic foot wear was mentioned. Additional records from Dr. Dole[22] show that in January 2002, Mr. Dupuy underwent the

_____

[20]

Exhibit 14.

[21]

Exhibit 6, p. 56; Exhibit 14, p. 6.

[22]

Exhibit 10.

12

recommended diagnostic procedures, which confirmed generalized peripheral polyneuropathy in the legs.

Alexandria VAMC progress notes beginning in July 2002 show Mr. Dupuy consistently complained of pain in his feet. He was given various pain medications, which were generally effective. In October 2006 he was taking Hydrocodone four times per day for pain.[23]

Mr. Dupuy saw Dr. Babson Fresh, a neurosurgeon, in 2002 at the recommendation of the Alexandria VAMC. Myelogram and post myelographic CT studies showed some spinal stenosis, but Dr. Fresh did not think the back problems were significant enough to explain Mr. Dupuy's complaints of foot pain. Instead, the neurosurgeon related the foot pain to chronic painful peripheral neuropathy, which could have come from positioning during the AAA repair surgery, problems with nerve circulation secondary to cross clamping of the aorta, or hemorrhaging during the surgery. Dr. Fresh prescribed Oxycontin for pain.[24]

Records from the Baton Rouge VAMC[25] show that in July 2007, Mr. Dupuy requested Hydrocodone for the neuropathic pain in his feet. In September 2007, he was taking medication for hypertension, coronary artery disease, and neuropathy. In December 2007, his creatinine was reported as 1.5, with a normal reference range of .6

---

[23]
   Exhibit 6.
[24]
   Exhibit 12.
[25]
   Exhibit 8.

to 1.3. At that time, Mr. Dupuy reported he had been taking four Lortab daily for the previous four years secondary to foot pain. The prescription was renewed.

In September 2006, Mr. Dupuy's attorney referred him to Dr. James Quillin, a psychologist, for evaluation. Mental status examination showed good attention and concentration, but some limited immediate recall memory. His mood was depressed, his insight was superficial, and his judgment functions were impaired. Dr. Quillin administered psychologic studies, which suggested a probable moderate level of depression, substantial cynicism, anxiety, and mildly negative treatment attitudes. Accordingly, the psychologist diagnosed a Mood Disorder with Anxious Features.[26]

## F. Albert Dupuy's Condition and Circumstances at Trial

At the time of trial, Mr. Dupuy had been divorced from Lorraine Dupuy for approximately one year, but they were living together and planned to remarry.[27] Mr. Dupuy explained that his previous back injury continued to bother him and caused pain down his legs and into his feet. The pain limited his abilities to walk and bend over. However, Plaintiff testified the problems he had with his feet after the AAA repair surgery were different than those he experienced as a result of his back injury. In addition to foot pain, Mr. Dupuy was continuing to complain of depression, problems with memory and concentration, difficulties with social functioning, periods of intense

---

[26]

    Exhibit 11.

[27]

    Mr. and Mrs. Dupuy originally married in 1956. Mr. Dupuy testified he filed for divorce because of Mrs. Dupuy's gambling problems. The final Judgment of Divorce was signed March 9, 2007. (Exhibit 5.)

emotional reactions,[28] suicidal ideation, loss of interest in activities, and sexual dysfunction.[29] His medications decreased his foot pain, but he still estimated the pain as a "five" on a scale of "one" to "ten." Mr. Dupuy also explained he was taking medication for depression, a heart condition/high blood pressure, and acid reflux. He initially had his pacemaker checked regularly, but, against medical advice, he had discontinued that practice. Under cross-examination, Mr. Dupuy said he had seen Dr. Fresh, a neurosurgeon in Alexandria, on two occasions, but he had not returned, because Dr. Fresh could not give him any relief. Mr. Dupuy also saw Dr. Quillin, a psychologist, but Plaintiff stopped that treatment. Further, he admitted he has not been told he will need dialysis in the future.

Mr. Dupuy had moved to Baton Rouge and was working for the Department of Homeland Security as a night-shift security guard. His duties included monitoring a yard that housed tanker trucks and fuel. He worked seven nights on and then seven nights off, and he logged about ninety-five to ninety-six hours per week. He had also worked as a security guard at an office building. He had been fired from his job at a funeral home after he lost his temper on several occasions.

---

[28]

A few months prior to trial, Mr. Dupuy lost his temper and struck his wife when she returned home late at night after gambling. He was eventually arrested and spent the night in jail.

[29]

Mr. Dupuy had taken medication for this condition, but discontinued the treatment because he was uncomfortable with the side effects.

## G. Lorraine Dupuy's Condition and Circumstances at Trial

Lorraine Dupuy, who was born in 1938, lived in Baton Rouge at the time of trial with her ex-husband, Albert Dupuy, and she planned to marry him again.[30] Although Mrs. Dupuy had suffered with depression and gambling problems before Mr. Dupuy underwent the AAA repair in 2001, she testified these difficulties worsened after the surgery. A few months after Mr. Dupuy filed for divorce, Mrs. Dupuy tried to kill herself and was subsequently treated in a psychiatric hospital.[31] At the time of trial, she was seeing a psychiatrist in Alexandria on an outpatient basis and was taking an antidepressant medication.

## H. The Experts

### (1) Dr. Knight

Dr. Charles Knight, retained by Defendant, was accepted by the Court as an expert in the area of vascular surgery. In connection with his testimony, he had reviewed all of Mr. Dupuy's VAMC medical records, the depositions of Mr. Dupuy and the other physicians involved, the deposition and report of Plaintiff's expert, and some outside medical records regarding previous leg symptoms Mr. Dupuy experienced in 1994 and 1995.

---

[30]

According to Mrs. Dupuy, she and Mr. Dupuy only lived apart for approximately five or six months.

[31]

Mrs. Dupuy testified she had received inpatient psychiatric treatment for eleven to twelve days at a time on four separate occasions since October 2001.

Dr. Knight, who practiced in Shreveport, explained that in October 2001, he had not yet performed any endovascular AAA repairs. He said the less-invasive option was properly offered to Mr. Dupuy. However, at the time, it was not known how durable the endovascular treatment would be. Indeed, some patients who underwent the less-invasive procedure later needed an open aneurysm repair. Given Mr. Dupuy's relatively young age, and the newness of the endovascular procedure, Dr. Knight felt most surgeons would have recommended an open aneurysm repair for Mr. Dupuy in October 2001.

As to the arterial clamping time, Dr. Knight initially testified the time periods explained by Dr. Phifer were "certainly out of the ordinary," and were "unusually long," but the expert did not feel they rose to the level of a breach of the standard of care.[32] Dr. Knight said he did not think he had ever performed an AAA repair surgery with a clamp time in excess of three hours. Under rigorous cross-examination, Dr. Knight admitted he was unable to say whether negligence did or did not occur during the surgery.

The expert further explained that the operative report was inadequate, and probably inaccurate, because it did not reflect what happened during the surgery to result in the amount of blood lost, which, according to Dr. Knight, was more than routine.

As to the post-operative complications, Dr. Knight gave the opinion that the renal failure requiring dialysis was caused by the surgery, but, under the circumstances

[32]

Interestingly, Dr. Knight also volunteered that surgeries often take longer in teaching institutions, because the residents are obligated to perform a portion of the procedure as part of their educational requirements. No explanation was provided, however, on the medical propriety of this additional time *vis-a-vis* the patient's welfare.

presented, such renal failure would not be unexpected. He further noted the condition was recognized and treated appropriately. When asked to analyze blood testing done in December 2007, Dr. Knight agreed Mr. Dupuy had some kidney dysfunction. However, the expert did not think future dialysis would be needed, and he felt Mr. Dupuy's creatinine levels had remained relatively stable since he was discharged in 2001.[33] Dr. Knight also opined the pacemaker was necessitated by the fact Mr. Dupuy underwent major surgery, which placed stress on his heart. According to Dr. Knight, neither the renal failure nor the need for the pacemaker was caused by a breach of the applicable standard of care. Likewise, Dr. Knight did not relate any complaints of neuropathy to a breach of the standard of care by Dr. Phifer or his staff. Dr. Knight did not feel any neuropathy would have been caused by the short-term dialysis in this case, but he stated he would defer to a neurologist or a neurosurgeon regarding the cause of any neuropathy. In general, Dr. Knight testified the complications suffered by Mr. Dupuy were similar to those that would be expected in the case of a ruptured aortic aneurysm.

### (2) Dr. Mehigan

The discovery deposition of Dr. John Thomas Mehigan, which was entered into evidence without objection, shows Dr. Mehigan, a board certified vascular surgeon, was

---

[33]

Blood test results from the Alexandria VAMC demonstrate that from May 2003 through March 2006, Mr. Dupuy's creatinine varied from a low of 1.2 to a high of 1.6, with a normal reference range being .7 through 1.2. During the same time, Plaintiff's BUN was recorded as low as 18 and as high as 28, with a normal reference range being 7 through 20. (Exhibit 6, pp. 31-32.) Laboratory results prior to the surgery show Mr. Dupuy's creatinine ranged from 1.1 through 1.3, and his BUN ranged from 15 to 22 during the period of October 1998 through July 2001. (Exhibit 9.)

retained by Plaintiffs to analyze the medical records.[34] He also reviewed the depositions of Dr. Richardson, Dr. Knight, and Dr. Phifer, as well as Dr. Knight's report. Dr. Mehigan explained the following eventualities, which he felt were supported by the medical records, were not normally associated with AAA repair surgery: the six and one-half hour operative time; the blood loss of eighteen units over three days; the interoperative and postoperative acidosis; the extended cross-clamp time; the need for a fasciotomy; and the renal failure. Dr. Mehigan said that it was possible for these complications to arise in a difficult aneurysm repair surgery, but he did not see anything in the medical records to indicate this was a difficult surgery. Indeed, Dr. Mehigan noted that his review of the CT scans showed the surgeon was presented with a lengthy "neck" above the aneurysm, which would have decreased the complexity of the procedure. Additionally, the area to be sewn in the iliac systems appeared to be straightforward. These indications, coupled with the lack of any particular difficulties noted in the operative report or in the depositions of either Dr. Richardson or Dr. Phifer, lead him to conclude the procedure was inadequately performed.

With particular reference to the arterial clamping time, Dr. Mehigan stated,

Well, the aortic cross-clamp time in particular implies that you're technically not very good or that something very, very strange is going on. [It's] [a]lmost unheard of. That cross-clamp time is . . . more than three times the usual. And it's a life-threatening thing to do to somebody.[35]

---

34

Exhibit 18. It does not appear that Dr. Mehigan was actually tendered by Plaintiffs or accepted by the Court as an expert witness.

35

Exhibit 18, p. 28.

From his review of the records, Dr. Mehigan felt the only thing that should have complicated the surgery was Mr. Dupuy's obesity.

When asked if Mr. Dupuy had recovered, Dr. Mehigan said the patient had sustained permanent damage from the "coronary event," which Dr. Mehigan identified as a heart attack, documented in the post-operative records. He also predicted a "substantial" likelihood that Mr. Dupuy would need future dialysis, in light of what Dr. Mehigan viewed as permanent kidney damage. He further opined Mr. Dupuy would continue to have swelling and pain in his left leg secondary to the fasciotomy. Dr. Mehigan admitted, however, that he did not recall reviewing any of Mr. Dupuy's medical records after November 2001.

I. Stipulations

The parties agreed that, pursuant to certain contractual provisions, if liability were to be imposed for the actions of the physicians, such liability would fall on the Shreveport VAMC. They further agreed that Plaintiffs had properly exhausted their administrative remedies prior to filing suit, and that the total amount sought administratively by Mr. Dupuy was $800,000, and the total amount sought administratively by Mrs. Dupuy was $300,000. Finally, the parties agreed that Joint Exhibit 25 accurately represented the medical bills incurred by Mr. Dupuy ($56,709.30) and the Medicare payments made. They further stipulated that any Medicare reimbursement would be handled by the parties.

## II. LAW AND ANALYSIS

### A. Liability

In a suit brought under the Federal Tort Claims Act ("FTCA"),[36] "the United States is liable in damages only if a private person would be liable for the same allegedly negligent act or omission under the laws of the state within which the act or omission occurred." Skipper v. United States, 1 F.3d 349, 352 (5th Cir. 1993). Therefore, Louisiana's laws on medical malpractice apply in the instant case.

Under Louisiana law, the plaintiff in a medical malpractice suit has the burden of proving, by a preponderance of the evidence:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.

> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injures that would not otherwise have been incurred.

La. R.S. 9:2794.

As the Fifth Circuit has outlined,

---

[36] 28 U.S.C. § 2671, *et seq.*

It is "generally necessary" to use an expert witness to prove a medical malpractice claim. Broussard v. Andersson, 921 So.2d 128, 132 (La. App. [4th Cir.] 2005); see also Linder v. Hoffman, 894 So. 2d 427, 431 (La. App. [4th Cir.] 2005) (stating the general rule that in order to establish a claim of medical malpractice, the plaintiff "must demonstrate the degree of care ordinarily exercised by a physician in a particular medical specialty"). Importantly, "[w]here the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only physicians in that specialty may offer evidence of the applicable standard of care." Id. In other words, to succeed in a medical malpractice claim against a medical specialist, the plaintiff must offer testimony of the applicable standard of care in the particular specialty of the allegedly negligent doctor and the proffered expert must specialize in that peculiar field.

Cleveland ex rel. Cleveland v. U.S., 457 F.3d 397, 403-04 (5th Cir. 2006).

Additional guidance for the trial court regarding interpretation of the evidence in medical malpractice claims is provided by Louisiana jurisprudence, which explains,

> The physician's conduct is always evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection nor evaluated with the benefit of hindsight. Lefort v. Venable, 95-2345, p. 4 (La. App. 1st Cir. 6/28/96), 676 So. 2d 218, 220.

> When medical experts are called to testify, the views of such expert witnesses are persuasive, although not controlling, and any weight assigned to their testimony by the trier of fact is dependent upon the facts on which the opinion is based as well as the expert's professional qualifications and experience. Salvant v. State, 05-2126, p. 14 (La. 7/6/06), 935 So. 2d 646, 656; Bradbury v. Thomas, 98-1678, p. 8 (La. App. 1st Cir. 9/24/99), 757 So. 2d 666, 673. The trier of fact must assess the testimony and credibility of all the witnesses and make factual determinations regarding these evaluations. Hoot v. Woman's Hospital Foundation, 96-1136, p. 6 (La. App. 1st Cir. 3/27/97), 691 So. 2d 786, 789-790, writ denied, 97-1651 (La. 10/3/97), 701 So. 2d 209.

Thibodaux v. Leonard J. Chabert Med. Ctr., 981 So. 2d 686, 689-690 (La. App. 1st Cir. 2007).

In this case, we find the salient issue to be whether the aortic cross-clamp time during the surgery was a breach of the standard of care.[37] As is outlined in detail above, Dr. Phifer, the vascular surgeon who actually performed the procedure, testified the first two clamps were removed after approximately two hours, and the third clamp, on the left side, was taken off after three to three and one-half hours. This is the more conservative estimate of the actual cross-clamp time. Dr. Mehigan, Plaintiffs' vascular surgery expert, said his review of the medical records supported a cross-clamp time of more than four hours on the left side.

According to Dr. Mehigan, most uncomplicated open AAA repairs require a cross-clamp time of approximately one hour. He classified Mr. Dupuy's surgery as relatively straightforward, given the long "neck" available above the aneurysm, the location of the aneurysm, and the lack of any particular difficulties being noted in either the operative report or the depositions of the surgeons who performed the procedure. Therefore, he felt the extended cross-clamp time, even if it were only three hours to three and one-half hours, as estimated by Dr. Phifer, breached the applicable standard of care.

Finding this evidence is sufficient to satisfy Plaintiffs' initial burden, we turn to Defendant's expert, Dr. Knight. Initially, he testified that the three to three and one-half hour cross-clamp period, while out of the ordinary and unusually long, was not a breach of the standard of care. The expert then explained he did not think he had ever performed an AAA repair surgery with a clamp time in excess of three hours. Finally,

---

[37]

Although evidence was adduced regarding the sufficiency of pre-operative lower extremity vascular examination, that issue is not determinative. The parties have agreed Mr. Dupuy needed surgery to have the aneurysm repaired.

23

he admitted he was unable to say whether negligence did or did not occur during the surgery.

Neither Dr. Richardson nor Dr. Phifer was able to offer a credible explanation for the extended cross-clamp time. While Mr. Dupuy was, indeed, significantly overweight at the time of the surgery, the doctors explained this condition would extend the surgical time before and after, not during, the arterial clamping. Likewise, although the complexity of the operation was increased by the fact the aneurysm included the common iliac arteries, there was evidence approximately fifty percent of AAA repairs include these vessels. Further, the procedure was not as complicated as it would have been if the renal or internal iliac arteries had been involved.

Finally, the medical records do not justify the cross-clamp time. Indeed, except for the length of the procedure and the inordinately high blood loss, documentation regarding the surgery is not noteworthy. As both experts testified, under the circumstances, the operative report is woefully inadequate. Under these circumstances, we are compelled by the evidence to find a breach of the standard of care, because of the excessive clamp time.

Having found a breach of the standard of care, we turn to the issue of causation. Dr. Mehigan explained that the significant post-operative complications were of the type expected when one suffered a ruptured aneurysm, not an AAA repair of the kind involved here. Dr. Phifer did not know what had caused the compartment syndrome that necessitated the fasciotomy, but he thought it could have resulted from the period of clamping or from improper positioning. Dr. Knight said he would defer to a neurologist

or neurosurgeon regarding the cause of Plaintiff's polyneuropathy. Dr. Fresh, the neurosurgeon who evaluated Mr. Dupuy in 2002, said the neuropathy could have been caused by the positioning of Plaintiff's body during the surgery, problems with nerve circulation secondary to cross clamping of the aorta, or hemorrhaging during the procedure.

Although the renal failure, the acidosis, the transfusion and fluid issues, the heart problem necessitating a pacemaker, the mental problems, the need for dialysis and a ventilator, and the extended period of rehabilitation may have been predictable under the circumstances, the evidence shows they were caused by the inappropriately performed surgery.

B. Damages

La. R.S. 40:1299.42(B)(1) provides:

The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and costs.

This cap on damages applies per patient, not per plaintiff. "Because the right of action in [a] loss of consortium claim is derived from the primary victim's injuries, recovery is restricted to the . . . per [patient] limits." Hollingsworth v. Bowers, 690 So. 2d 825, 832 (La. App. 3d Cir. 1996).

We have been unable to find jurisprudence addressing the types of injuries sustained by Mr. Dupuy, and the parties have not provided any applicable authorities. As noted above, Mr. Dupuy was sixty-three years old at the time of the surgery. He had

been disabled secondary to a previous back injury for approximately seven years, and he was receiving SSA disability benefits. His back and leg pain was under sufficient control that he was able to work as a manager at a mini-storage facility. After the AAA repair surgery, he was in intensive care for several weeks. He was unconscious for a large portion of the time, during which period he was receiving dialysis, had several transfusions, and was on a ventilator. The fasciotomy was performed the day after the initial surgery. He suffered a cardiac event and was given a pacemaker the day before he was discharged. Mr. Dupuy was then transferred to a rehabilitation hospital, where he stayed for approximately one month. Within three months of the surgery, Mr. Dupuy was able to drive again, and he estimated he was able to ambulate without assistance within five to six months of the surgery. He did suffer some depression and related issues, for which he was given medication. At the time of trial, Mr. Dupuy's main complaints were of severe pain and fluctuating temperature extremes in his feet. These conditions had remained relatively unchanged since his discharge from the hospital and were being treated somewhat successfully with powerful pain medications. There was no indication this condition would resolve in the near future. Despite this pain, Plaintiff had been able to return to work as a security guard.

Under these circumstances, we believe a general damage award of $250,000 plus the agreed-upon past medical expenses of $56,709.30 reasonably compensates Mr. Dupuy for the damages he has sustained.

The evidence shows Plaintiff will most likely continue to need medication for his neuropathy. However, given the absence of any evidence regarding the potential costs

of such future care, the Court would be forced to engage in inappropriate speculation and guesswork if it were to assign a monetary value to those claims. Additionally, it appears the expenses associated with Plaintiff's future medical care will be adequately covered through either Medicare or benefits available to Mr. Dupuy as a veteran.

Louisiana jurisprudence does provide more guidance when it comes to Mrs. Dupuy's loss of consortium claim. In <u>Melançon v. Lafayette Ins. Co.</u>, 926 So.2d 693 (La. App. 3d Cir. 2006), Plaintiff's husband of thirty years suffered depression, anxiety, chronic pain, and erectile dysfunction following a surgical procedure. Although the appellate court noted the $10,000 loss of consortium award was relatively low, it affirmed the trial court's decision.

A spouse received a $15,000 loss of consortium award after his wife underwent four surgeries and none months of occupational therapy. Plaintiff helped his wife with her personal needs after the accident, and he continued to assist with household chores at the time of trial. <u>Wakefield v. Reliance Nat. Indemn. Co.</u>, 845 So.2d 1238 (La. App. 5th Cir. 2003).

Applying these parameters to the instant case, we note that although Mr. and Mrs. Dupuy have divorced, they plan to remarry, and the divorce was directly related to Mrs. Dupuy's gambling problems, which existed prior to October 2001. Additionally, while Mrs. Dupuy did provide significant assistance to her husband during his rehabilitation, she did not visit him in the hospital daily, and he was able to regain his abilities to care for himself within a few months. All of this positive information is

tempered, however, by the fact of their deteriorating relationship during that period. Under these circumstances, we make an appropriate award of $20,000 to Mrs. Dupuy.

## III. CONCLUSION

For the foregoing reasons, this Court RENDERS JUDGMENT AS FOLLOWS: IN FAVOR OF PLAINTIFF, Albert Dupuy, and against Defendant, United States of America, in the amount of $306,709.30 plus costs as provided by law; and IN FAVOR OF PLAINTIFF, Lorraine Dupuy, and against Defendant, United States of America, in the amount of $20,000.00 plus costs as provided by law.

SIGNED on this _____ day of September, 2008 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE